IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiffs, | 4:06CR3145 |
| vs. | |
| O'DARI ZANDAGHE WILEY, | MEMORANDUM AND ORDER |
| Defendants. | |

Mr. Wiley seeks compassionate release. (Filing no. 163.) I grant the motion.

I have come to this conclusion after consulting all the medical records (filing no. 173), the compassionate release report from the probation officer (filing no. 174), the excellent briefs of counsel[1] (filing no. 167, filing no. 176 and filing no. 179) and publicly available data.[2]

*Background*

Mr. Wiley is now 35 years of age. Remembering, with irony, that he described his medical condition as "good" during the preparation of the presentence report when his age was 21, his medical condition has since plummeted. On June 22, 2020, the Bureau of Prisons made the following note when he was seen at the "Chronic Care Clinic":

---

[1] I thank and compliment Mr. Summers and Mr. Grugan for assisting Mr. Wiley.

[2] To be clear, I have also considered all the records submitted by defense counsel although they may be duplicative of the records submitted by the probation officer.

> [Wiley has a] history of Hypertension, Hyperlipidemia, Coronary Artery Disease. Chronic Unstable Angina, Coronary Arteriosclerosis, and an Acute Myocardial Infarction[3] in November 2018 resolved with a PTCA stent. Inmate has been scheduled with the Cardiology follow ups twice a year and has been sent out to local ER hospitals for episodes of Angina several times. Inmate's brother was deceased at age 38 from an Acute MI.[4] Inmate is current on his medications and needs follow up labs.

(Filing no. 173-1 at CM/ECF p. 9.)

As defense counsel points out, the record is replete with evidence of ongoing and serious heart complications:

> (*See, e.g.*, ECF 173-2 at 1900 (BOP report from May 2019 attack of severe chest pain), 2044–46 (November 2019 cardiologist report listing diagnoses of CAD, hypertension, angina, and cardiomyopathy, among others, as well as "Malformation of Coronary Vessels"), 2061–62 (August 2019 left heart catheterization showing that the LAD artery in which Mr. Wiley had his heart attack was "significantly aneurysmal," although not then obstructed), 2069 (August 2019 lab result "consistent with a diagnosis of [congestive heart failure] in the appropriate clinical setting"), 2214–16 (March 2019 cardiologist treatment for

---

[3] *See, e.g.*, Mechanic OJ, Grossman SA, *Acute Myocardial Infarction* (Aug. 11, 2020), https://www.ncbi.nlm.nih.gov/books/NBK459269/. "Acute myocardial infarction is one of the leading causes of death in the developed world. The prevalence of the disease approaches three million people worldwide, with more than one million deaths in the United States annually. . . . An MI results in irreversible damage to the heart muscle due to a lack of oxygen." Additionally, a nonmodifiable risk factor is a family history of the disease. *Id*.

[4] Wiley's mother confirmed to the probation office that there is a family history of the disease. (Filing no. 174 at CM/ECF p. 4.)

2

> chest pain and shortness of breath); 173-3 at 2372–73 ("Cardiovascular Procedure Report" from November 2018 heart attack and stent procedure), 2386 (hospital report from November 2018 showing that Wiley had chest pain for ten days before being taken to the hospital).)

(Filing no. 179 at CM/ECF p. 6.)

Mr. Wiley has sought and been denied compassionate release from the Bureau of Prisons. (Filing no. 169-6 at CM/ECF p. 2.) That is, he has exhausted his remedies as required by law.

On September 20, 2006, an Indictment was filed charging Mr. Wiley and co-defendant Tallas Lapaul Harris with one count of conspiracy to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 spanning the time period between January 1, 2002, and April 11, 2006. (Filing 1.) On May 10, 2007, Mr. Wiley pled guilty to Count I of the Indictment. At the time he was indicted, and as noted above, Mr. Wiley was only 21 years of age.

On June 5, 2007, a Petition for Action on Conditions of Pretrial Release was filed alleging Wiley had violated the terms of his pretrial release order by failing to report to his pretrial services officer that he had been arrested on state charges of second-degree murder[5] and that he was being held in state custody. (Filing no. 60.) That petition was withdrawn as moot when I sentenced him. While he was on federal pretrial release for seven months, he was compliant. (Filing no. 84 at CM/ECF p. 4 ¶ 10.)[6]

---

[5] The murder charge was the most serious. There were other charges too.

[6] This offense was alleged to have taken place *before* Wiley was indicted in this case. More about that later.

3

On November 7, 2007, Mr. Wiley was sentenced by me to 151 months in prison. (Filing no. 86, Filing no. 92.) I could not consider the state charges at the time I sentenced Wiley because they were unresolved and unrelated. His Criminal History was II when he was sentenced by me. He had never done a day in prison.

Subsequently, the state charges, referred to above, were substantially reduced. He was sentenced for unlawful discharge of a firearm into an occupied vehicle. He was sentenced on June 30, 2009, to 20 to 20 years in prison.[7] He was also sentenced to one year in prison for the misdemeanor charge of assault by a confined person without using a weapon. That charge had been reduced from a felony. The state judge ran her state sentences concurrently and, without specifically mentioning my case, "consecutive to any other sentence." The date the gun offense was committed was August 6, 2006, and the date the assault offense was committed was September 12, 2008.[8] In other words, they did not occur when Wiley was on federal pretrial release, and they were outside the time period of the federal conspiracy charge.

Mr. Wiley has completed his state time and has no parole obligation.[9] He was given 364 days of "good time" and that, coupled with the "time served" credit of

---

[7] He was given credit for 766 days for time already served.

[8] I take judicial notice of the state court records. *See Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005) (court may take judicial notice of public records); Federal Rule of Evidence 201 (providing for judicial notice of adjudicative facts). Nebraska's judicial records may be retrieved online through the JUSTICE site, https://www.nebraska.gov/justice/case.cgi. (The state district court numbers relevant to this matter are CR 07-766 and CR 08-1131.)

[9] Nebraska Department of Correctional Services Inmate Locator. Earlier in the case, it was thought that Mr. Wiley would serve the federal sentence first and then the state sentence. I have confirmed with SUSPO Kelly Nelson that this was erroneous, as clearly indicated by the Nebraska Department of Correctional Services Inmate Locator. Therefore, he is eligible for federal release, as his state sentence has been served—he was *mandatorily* discharged by Nebraska on June 24, 2017.

766 days given by the sentencing judge, caused him to be released to the federal detainer on June 24, 2017. He has been in the Bureau of Prisons for slightly more than three years.

On March 5, 2012, Wiley filed a motion seeking a sentence reduction based on changes to the crack cocaine Guidelines. On April 11, 2012, the motion was granted, and Wiley's sentence was reduced to 121 months. (Filing no. 115, Filing no. 116.)

On December 4, 2014, Wiley filed a second request for a sentence reduction pursuant to changes in the Guidelines. (Filing no. 122.) On June 1, 2015, Wiley's sentence was reduced to 120 months. (Filing no. 130.) On October 26, 2015, Wiley filed a motion to correct that sentence reduction, seeking additional credit toward his sentence. (Filing no. 132.) That motion was denied on November 5, 2015. (Filing no. 135.)

Mr. Wiley filed a motion to reduce his sentence pursuant to the First Step Act on March 4, 2019. That motion was denied on March 6, 2019. (Filing no. 138, Filing no. 139.)

Mr. Wiley filed a second motion to reduce his sentence pursuant to the First Step Act on January 6, 2020. (Filing no. 152.) On February 25, 2020, that motion was granted in part and denied in part, and Wiley's sentence was reduced to 97 months. (Filing no. 159, Filing no. 160.) At that time, I was informed by the probation officer that according to the BOP, "his heart condition is something that would normally be seen in a man of 65 or 70 rather than his age of 34. It was also noted, Mr. Wiley has not been a disciplinary problem and is a normal functioning inmate with the exception of his heart condition." (Filing no. 158.)

Mr. Wiley is set to be released from federal prison on June 16, 2024, and he is currently being held at FCI Beaumont Medium.[10] Out of 329 inmates tested at that facility, 96 have tested positive for COVID as September 15, 2020, the last time I checked using the BOP's tracker.[11] That is, slightly more than 29% of the inmates who were tested had the virus. At that facility, 6 inmates and 6 staff members have currently confirmed active cases as of September 15, 2020.[12]

On June 22, 2020, the Bureau of Prisons denied Mr. Wiley entry into the RDAP (residential drug treatment) program although it acknowledged that he had served enough time to enter the program. The Bureau concluded that there was insufficient "evidence of a potential problem with alcohol or drugs in the 12 months prior to his arrest for the instant offense." (Filing no. 174 at CM/ECF p. 3.)

Mr. Wiley has a very good release plan with law-abiding parents who are willing to house him and help him without charge. The probation officer advised me of the following:

> On August 10, 2020, the undersigned officer made telephone contact with the parents of Mr. Wiley, whom Mr. Wiley would reside with if released. Both Ms. And Mrs. Wiley confirmed they were willing and able to assist their son should his request for compassionate release be granted.
>
> Mr. Wiley advised, he is a retired law enforcement officer and a Vietnam Veteran. There is no expectation for their

---

[10] Here. (Search by name.)

[11] Here. (Search FCI Beaumont Medium using the "Covid-19 Inmate Test Information" spreadsheet, selecting Beaumont Medium.)

[12] Here (Use the map function for confirmed active cases and click on the black button closest to the Louisiana border in southern Texas and then select Beaumont Medium.)

son to pay rent or utilities. They advised; until he is approved for medical assistance through the state or benefits via employment, they would pay for all medical costs. Mr. Wiley reported Jonestown is a town of approximately 1,700 people with minimal criminal activity associated with where they live. If released, they would be able to provide transportation from the BOP to their home.

Mrs. Wiley[13] reported, Mr. Wiley was a football player in high school and an honor roll student. She advised, he has obtained a welding certificate and was confident that with his experience, he would have no problems finding employment. However, both Mr. and Mrs. Wiley advised they would need to have Mr. Wiley evaluated by a specialist to determine Mr. Wiley's ability to be employed. They expressed a desire for him to work if medically cleared by a doctor.

Mr. and Mrs. Wiley denied there to be any drugs at their residence. They reported, Mr. Wiley was in possession of a firearm but upon learning of Mr. Wiley's relocation plan, they turned the firearm over to the chief of police.

Mrs. Wiley expressed great concern over her son's health as she has been diagnosed with the same disease as Mr. Wiley. She advised that she maintains good health through medications, exercise, and a good diet. She relayed that she can assist Mr. Wiley in maintaining the same lifestyle in an effort to control his symptoms.

Due to Mr. Wiley's release plans not being in the District of Nebraska, the probation office in the District of Northern Mississippi must approve of the release address as they would provide supervision of him should the compassionate release request be granted. On August 7,

---

[13] The presentence report indicated that Mrs. Wiley was then employed as a social worker. (Filing 84 at CM/ECF p. 14 ¶ 59.)

7

2020, the undersigned officer submitted a request to the Mississippi probation office to conduct their own relocation investigation to determine suitability for release.

On August 10, 2020, The District of Northern Mississippi completed their investigation to determine if Mr. Wiley's release address was suitable. A home investigation was conducted virtually at the residence of 56 Coahoma Rd, Jonestown, Mississippi. It was noted, the home of Mr. and Mrs. Wiley's home a three-bedroom and two bath mobile home. The home is in good condition and fully furnished. The District of Northern Mississippi has agreed to supervise him if the Court grants compassionate release. Ms. Wiley indicated, she could provide transportation to Jonestown, if released.

(Filing no. 174 at CM/ECF pp. 3-4.)

*Analysis*

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i),[14] a defendant may (after exhausting his administrative remedies) move for reduction of his term of imprisonment based

---

[14] In pertinent part, the statute reads:

> the court, upon motion of the Director of the [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the

upon "extraordinary and compelling reasons." After considering the factors enumerated in 18 U.S.C. § 3553(a), I may grant the motion if extraordinary and compelling reasons warrant the reduction, and such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. And pursuant to U.S.S.G. § 1B1.13(2), the court must also find that the defendant is not a danger to the safety of any other person or to the community.[15] I now make all the findings and conclusions required for granting compassionate release. Briefly, I elaborate.

First, it cannot be disputed that Mr. Wiley is substantially more likely to die if he gets COVID than any normal person, even though he is not elderly. This is due

---

> factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

[15] Since U.S.S.G. § 1B1.13 was not amended to conform to the statute, that Guideline cannot trump the statute to the extent there is a conflict. That said, the "danger to the community" portion is a part of any § 3553(a) analysis under any circumstance. But, to the extent that this Guideline and related commentary is otherwise read by the government to restrict Mr. Wiley's ability to seek compassionate release, I reject that argument because it is not supported by cases from this court or the Eighth Circuit Court of Appeals. *See*, *e.g.*, *United States v. Gilmore*, No. 8:17CR141, Filing 157 at CM/ECF p. 8 (D. Neb., June 1, 2020) ("As recently explained by Chief Judge Gerrard, 'the plain language of § 1B1.13 establishes guidelines only for a reduction of sentence sought by a 'motion of the Director of the [BOP],' which this isn't.' *Jenkins*, 4:15-CR-3079. Given the apparent disconnect between § 3582(c)(1)(A) and § 1B1.13, the statute supersedes the Guidelines 'written to provide guidance only for the pre-amendment version of § 3582.' *Id*.; *see also United States v. Stoneking*, 60 F.3d 399, 402 (8th Cir. 1995) (explaining the statute controls when a conflict exists between a statute and the Guidelines). Accordingly, while § 1B1.13 is helpful for the Court's analysis, it does not limit the Court's discretion under § 3582(c)(1)(A) as the government suggests.").

9

to his extremely fragile heart condition—a condition that also killed his brother when the brother was a mere three years older than Mr. Wiley is now. Counsel for Mr. Wiley has done a superb job of laying out the medical support for this point.

> The CDC lists "Serious Heart Conditions," including coronary artery disease and hypertension, among the conditions that increase a patient's risk of "severe illness from COVID-19" at any age. *See* Centers for Disease Control and Prevention ("CDC"), *Certain Medical Conditions and Risk for Severe COVID-19 Illness* (July 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. In June 2020, the CDC released an analysis of more than 1.3 million confirmed COVID-19 cases showing that patients in their 30s with underlying health problems – including heart disease/hypertension – were more than five times likelier to be hospitalized (24.2% vs. 4.4%), five times likelier to be admitted to an ICU (5.3% vs. 0.9%), and **twenty-eight times likelier to die** (2.8% vs. 0.1%) than people in the same age cohort without underlying conditions. *See* Ex. C, Erin K. Stokes, Laura D. Zambrano, Kayla N. Anderson et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22–May 30, 2020*, at 762–63 (June 19, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6924e2-H.pdf.

(Filing no. 167 at CM/ECF p. 3 (bold in original).)

Defense counsel provided further medical support:

> Continuing research further indicates that Mr. Wiley's fears are well-founded. To quote one recent paper, "[p]re-existing cardiovascular disease seems to be linked with worse outcomes and increased risk of death in patients with COVID-19, whereas COVID-19 itself can also induce myocardial injury, arrhythmia, acute coronary

10

syndrome and venous thromboembolism." Masataka Nishiga, Dao Wen Wang, Yaling Han et al., *COVID-19 and Cardiovascular Disease: From Basic Mechanisms to Clinical Perspectives* at 1, Nature Reviews Cardiology (July 20, 2020), https://www.nature.com/articles/s41569-020-0413-9.pdf; *see also* Paolo Zamboni, *COVID-19 as a Vascular Disease: Lesson Learned from Imaging and Blood Biomarkers* ("Zamboni Paper") at 1, Diagnostics (June 29, 2020), https://www.mdpi.com/2075-4418/10/7/440/htm ("COVID-19, a disease initially thought to be prominently an interstitial pneumonia with varying degrees of severity, can be considered a vascular disease with regards to serious complications and causes of mortality.")

In other words, there is evidence that COVID-19's deadliest effects occur in the cardiovascular system, not just the lungs. For example, in a peer-reviewed paper, an Italian vascular surgeon recounted the results of one study finding that 54.5% of hospitalized COVID-19 patients with a history of cardiovascular disease showed elevated levels of troponin, a biomarker associated with acute heart damage.[16] Zamboni Paper at 3. The death rate among these hospitalized patients – admittedly, a group that necessarily comprises the most severe cases – was nonetheless **69.44%**. *Id.* By contrast, only 13.2% of hospitalized patients without previous cardiovascular disease had elevated troponin levels, and among those patients the death rate was 37.5%, nearly half the rate of those with previous cardiovascular disease. *Id.* Put another way, hospitalized COVID-19 patients with underlying cardiovascular disease, like Mr. Wiley, were four times likelier – likelier than not, in fact – to suffer measurable heart damage than hospitalized patients without

---

[16] At note 3 to this brief, counsel adds: "For example, shortly after Mr. Wiley's heart attack in November 2018, his troponin level was measured at 13.15 ng/ml, more than 164 times the maximum normal reference level of 0.08 ng/ml. (*See* ECF 173-3 at 2347.)"

11

> cardiovascular disease. Of the more than half who had such heart damage, most died. Mr. Wiley's heart conditions vastly increase his risk of death from COVID-19.

(Filing no. 179 at CM/ECF pp. 7-8 (bold in original).)

Second, Mr. Wiley was indicted at age 21, and he is now approaching middle age. He has no problems with using drugs according to the BOP and our previous presentence report. He got along fine while on pretrial release in this case. While the crimes he committed, both state and federal, were extremely serious, he was not sentenced to death, and he has served 14 years of his life in prison atoning for his criminal behavior.

Fourteen years or so in both state and federal prison for a kid who had never been in prison before causes many a youngster to mature. That seems true here, as earlier this year I was told by the probation officer, when I reduced Wiley's sentence, that he has not been a disciplinary problem. Given the above—and particularly his placement with his father (a retired police officer and war veteran) and his mother, with a background as a social worker, who understands full well what it is like to suffer from the disease because she has it and who remembers painfully that one of Mr. Wiley's brothers died from the scourge and yet another child, Mr. Wiley, now suffers grievously from the awful medical condition—I do not believe Mr. Wiley is a danger to the community or anyone else.

Third, Mr. Wiley is much safer at home with his mother who has a background as a social worker and who intimately understands heart disease. The family will pay for his medical care until he can qualify for public assistance. Mrs. Wiley has learned how to deal with the disease through proper medication management, exercise, and a good diet. She affirmed that she can and will assist Mr. Wiley in maintaining the same healthy lifestyle in an effort to control his symptoms and, in turn, do a much better job than an institution of making sure her son has the best care possible to

avoid the interrelated problem of a severe heart condition that could easily become lethal if COVID were to strike.

Fourth, I have not forgotten about general deterrence. I have not forgotten about just punishment. I have not forgotten about the seriousness of the offense. I have not forgotten about all the other ins and outs of the Rorschach test we call § 3553(a). It would be easy to write this opinion denying the motion, but after a good deal of thought, I have decided the easy way would be the wrong way. If the government strongly disagrees, it should appeal.

IT IS ORDERED that:

1. Subject to the stay set forth in paragraph 2, the Defendant's motion for compassionate release (filing no. 163) is granted, and a "time served" prison sentence is granted. The motion to restrict (filing no. 178) is also granted.

2. There being a verified residence (56 Coahoma Rd, Jonestown, Mississippi) and an appropriate release plan in place, *this order is stayed* for up to fourteen days to make appropriate travel arrangements and to ensure the Defendant's safe release. The Defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the Defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure the Defendant's safe release, then the parties shall immediately notify me and show cause why the stay should be extended.

3. The probation officer from the District of Nebraska shall coordinate with the probation officer from the Northern District of Mississippi and the Bureau of Prisons to effectuate this order. Counsel for the Defendant shall also assist if necessary. The contact information for the "first chair" lawyer follows: Shawn F. Summers, Ballard, Spahr Law Firm, 1735 Market Street, 51st Floor,

Philadelphia, PA 19103; telephone, 215-864-8347; e-mail, summerss@ballardspahr.com.

4. The Clerk's office shall also immediately provide a copy of this Memorandum and Order and Judgment to Leslie Van Winkle, United States Probation Officer, who shall in turn provide copies to her colleague in Mississippi.

5. A separate Judgment (containing updated conditions of supervised release) is filed with this Memorandum and Order.

6. The Clerk's office shall hand-deliver a copy of this Memorandum and Order and accompanying Judgment to the U.S. Marshals Service, and the USMS shall expedite transmission of both documents to the Bureau of Prisons.

September 17, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge